UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
KEVIN M. ADLEY,             )
                            )
          Plaintiff,        )
                            )
     v.                     )     CIVIL ACTION
                            )     NO. 16-12265-WGY
KATHLEEN A. BURNS and       )
THOMAS M. BURNS,            )
                            )
          Defendants.       )
_____ )
```

YOUNG, D.J.                              May 15, 2018

**FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER FOR JUDGMENT**

## I.   INTRODUCTION

On November 10, 2016, the plaintiff Kevin M. Adley ("Adley") brought this action against his sister, Kathleen A. Burns ("Mrs. Burns"), and her husband, Thomas M. Burns ("Mr. Burns," and collectively, the "Defendants"), alleging breach of fiduciary duty, fraud and deceit, intentional misrepresentation, and unjust enrichment stemming from the joint ownership of a vacation property (the "Property"). Pl.'s V. Compl. ("Compl.") ¶¶ 40-57, ECF No. 1. Adley sought damages and the imposition of a constructive trust on the Property. Id. ¶ 58. The Defendants asserted a statute of limitations defense, as well as

counterclaims of breach of contract and unjust enrichment. Defs.' Answer & Countercls. 6, 11-12, ECF No. 11.

During the two-day bench trial on November 15 and 16, 2017, the Court heard testimony from Adley, Mrs. Burns, and Mr. Burns. After hearing closing arguments, the Court announced its preliminary findings of fact and rulings of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. See Electronic Clerk's Notes, ECF No. 43; 11/21/17 Trial Tr. at 32, ECF No. 44. It rejected the Defendants' statute of limitations defense and imposed a constructive trust on the Property. 11/21/17 Trial Tr. at 32. The Court ruled that a real estate broker will be appointed as a special master to ensure that the Property is sold in a commercially reasonable manner and that the proceeds will go to each party according to their relative percentage interests in the Property. 11/21/17 Trial Tr. at 32-34.

The Court then asked the parties to submit briefs addressing the appointment of a broker and the calculation of each party's relative interest in the Property. Id. The parties having done so, the Court now makes the following findings of fact and explains its rulings of law.

## II. FINDINGS OF FACT

### A. Initial Purchase of the Property

In or around June 1992, Adley and the Defendants decided to purchase the Property, which is located at 90 Uncle Barney's

Road in West Dennis, Massachusetts, in order to build a shared
vacation home.  List of Facts Established by Pleadings
("Admitted Facts") ¶ 2, Trial Ex. B15.  On July 16, 1992, the
parties purchased the Property as tenants in common, with Adley
having an undivided fifty percent interest and the Defendants
having an undivided fifty percent interest and the right of
survivorship.  Id. ¶ 5.

In addition to agreeing that Adley and the Defendants would
each respectively possess an undivided fifty percent ownership
interest in the Property, id. ¶ 3, the parties also agreed
equally to divide all expenses and costs, such as mortgage
payments, property taxes, insurance, utilities, and maintenance.
Id. ¶ 4.  Because Adley resided in California, and the
Defendants resided in Massachusetts, it was contemplated by the
parties that Adley would use this home a few times a year,
whereas the Defendants would enjoy use of the house more
regularly.  Pl.'s Requests Findings of Fact ("Pl.'s Statement of
Facts") ¶ 4, ECF No. 36; Defs.' Requests Findings of Fact
("Defs.' Statement of Facts") ¶¶ 13-14, ECF No.34.

At this time, according to the parties' oral agreement,
Adley began making monthly payments of $1,000 to the Defendants.
Defs.' Statement of Facts ¶ 10.  These payments were intended to
cover Adley's half of the monthly mortgage payments as well as
his portion of other expenses and costs.  Pl.'s Statement of

3

Facts ¶ 12.  The payments were deposited into a joint "reserve" account.  Id.; Defs.' Statement of Facts ¶¶ 15-16.  Adley made these contributions monthly from July 1992 through December 1998 pursuant to the parties' agreement.  Admitted Facts ¶ 10.  Adley continued to reside in California, using the Property a few times a year.  Id. ¶ 9.

The Defendants managed the Property's finances, maintaining the joint bank account and handling the payment of all expenses such as the mortgage, property taxes, homeowners insurance, and utilities.  Id. ¶ 19.  Mr. Burns handled all of the Property's bookkeeping and accounting.  Id. ¶ 20.  As part of this duty, he provided annual statements to Adley confirming that Adley was a fifty percent owner of the Property and setting forth the amount of mortgage interest and property taxes paid each year so that Adley could deduct these amounts from his federal and state income taxes.  Id. ¶ 17.

## B.  Mortgages and Refinancings of the Property

At the time of the initial purchase of the Property in 1992, in order to finance the purchase and the construction of a house on the Property, the parties jointly acquired a mortgage in the amount of $135,000.  Id. ¶ 6.  The parties refinanced this mortgage in 1993, granting Plymouth Mortgage, Inc. a mortgage in the amount of $132,000.  Id. ¶ 7.

In or about late 2001, Mrs. Burns informed Adley that Mr. Burns was having trouble sleeping because of $80,000 in credit card debt he had accrued. Id. ¶ 11. She asked Adley if he would be willing to have the Defendants take some equity out of the Property through refinancing so that Mr. Burns could pay off the debt, and she indicated that she and Mr. Burns would increase their monthly contribution to pay back over time the equity taken out of the property. Id. Adley agreed to the proposal. Id.

On February 22, 2002, the Property was transferred by deed from Adley and the Defendants as tenants in common to the Defendants as tenants by the entirety for zero consideration. Id. ¶ 12. The same day, the Defendants granted GMAC Mortgage Corporation ("GMAC Mortgage") a mortgage in the amount of $225,000, refinancing the property and paying off the existing mortgage balance of approximately $120,000. Id. ¶ 13. In March 2002, Mr. Burns sent Adley a check for $10,000 from the proceeds of the refinancing, and the Defendants kept $85,000 from the proceeds. Pl.'s Statement of Facts ¶ 28-29; Defs.' Answer & Countercls. 10 at ¶ 24.

On June 6, 2003, the Defendants refinanced the mortgage again, granting GMAC Mortgage a mortgage in the amount of $224,000 and paying off the existing mortgage. Admitted Facts ¶ 14.

In 2004, the Defendants obtained a home equity line of credit ("HELOC") on the Property without informing Adley. Pl.'s Statement of Facts ¶ 32. This HELOC eventually was rolled into another HELOC in 2006. Id. ¶ 33. The Defendants used the proceeds from the 2006 HELOC to pay for their daughter's college education. Id. ¶ 33; Defs.' Statement of Facts ¶ 43.

On July 15, 2016, the Defendants granted TD Bank a mortgage in the amount of $281,000 refinancing the subject property yet again and paying off the 2003 mortgage and 2006 HELOC. Admitted Facts ¶ 18. The Defendants did not advise Adley that they were refinancing the subject property. Id.

### C.   2015 Events

In or around February 2015, a frozen water pipe burst at the Property, causing damage that required repairs. Id. ¶ 15. The Defendants reported the incident to the homeowners' insurance company, hired contractors, and monitored repair work. Id. Adley did not visit the property during the repairs. Id. In or around April 2015, Adley and Mr. Burns began to discuss necessary and extensive repairs to the Property, and whether they would pay for the repairs, buy each other out, or sell the Property. Id. ¶ 16.

Adley claims that around this time, he asked Mr. Burns for a copy of the Property's title for the purpose of demonstrating residence in Massachusetts to obtain a license to carry a

firearm.  Pl.'s Statement of Facts ¶ 36.  He "became suspicious"
when Mr. Burns failed to provide him with a copy of the title,
and he then ordered a title search that showed that he had not
been a titled owner of the Property since February 2002.  Id. ¶
36-37.

### D.   Adley's Knowledge and Mr. Burns's Intent

The parties dispute the extent of Adley's knowledge as to
the deed transfer.  Adley claims that when he agreed to the 2002
refinancing, he granted a limited power of attorney to a
Massachusetts attorney for the purpose of executing
documentation to achieve the refinancing, but expressly told Mr.
Burns that the limited power of attorney was "[f]or refinance
purposes only" and did not authorize any changes in title to the
Property.  Pl.'s Statement of Facts ¶¶ 23-24.  He claims that as
a result, he was unaware of (and did not consent to) the deed
transfer.  Id. ¶¶ 26-27.  The Defendants claim that Adley,
facing financial strain of his own, had requested that his name
not be included on the new mortgage.  Defs.' Statement of Facts
¶¶ 22, 25.  According to the Defendants, Adley understood that
this meant there was a possibility that title would need to
change hands to complete the transaction, but never thereafter
asked whether the deed had been transferred.  Id. ¶¶ 26, 32-33.

It is undisputed that even after the 2002 title change, Mr.
Burns continued to provide annual statements to Adley detailing

the amounts of mortgage interest and property taxes paid so that
Adley could take advantage of the relevant tax deductions.
Admitted Facts ¶ 17.   Considering this fact together with
Adley's testimony, this Court finds that Adley was unaware of
the deed transfer.   The Court also finds, however, that Mr.
Burns was at the time unaware of the possibility that the United
States Tax Code might not allow non-titled owners to take these
deductions.   The Court finds that Mr. Burns continued to believe
Adley to be a fifty-percent owner in equity and that Mr. Burns
did not intend to commit or induce any fraudulent conduct by
sending Adley the statements.

## III. RULINGS OF LAW

### A.   Statute of Limitations

The Court first addresses the Defendants' statute of
limitations defense to Adley's charges of fraud and breach of
fiduciary duty.

When confronting state causes of action brought in federal
court pursuant to diversity jurisdiction, this Court applies the
state statute of limitations.   See, e.g., Deisenroth v. Numonics
Corp., 997 F. Supp. 153, 156 (D. Mass. 1998) (Saris, J.).   Under
Massachusetts law, claims for fraud and breach of fiduciary duty[1]

---

[1] Because in this case the Plaintiff's breach of fiduciary
duty claim "is essentially a reallegation of the fraud claim,"
the Court deems the breach of fiduciary duty claim to sound in
tort, rather than in contract, and consequently to be governed

are governed by the three-year statute of limitations.  Mass.
Gen. Laws ch. 260, §2A; LeLannic v. Smith, No. 16-P-1088, 2017
WL 1477353, at *2 (Mass. App. Ct. Apr. 25, 2017).  Though the
limitations period for tort actions "generally runs for three
years following the date of the injury," the Supreme Judicial
Court has "long held that, in certain circumstances, . . . basic
fairness dictates a more flexible approach."  Doe v. Harbor
Sch., Inc., 446 Mass. 245, 254 (2006).  Consequently,
Massachusetts courts have adopted the "discovery rule," under
which the limitations period does not begin to run until the
plaintiff "knew or should have known that the plaintiff had
sustained injury cause by a defendant's conduct."[2]  LeLannic,
2017 WL 1477353, at *2; see Pagliuca v. City of Boston, 35 Mass.
App. Ct. 820, 824 (1994).

"[U]nder Massachusetts law, a person has notice of a fact
when, from all the information at his disposal, he has reason to
know of it."  Michelin Tires (Canada) Ltd. v. First Nat'l Bank,
666 F.2d 673, 682 (1st Cir. 1981).  Because Mr. Burns continued

---

by the statute of limitations applicable to torts.  Howell v.
Birnberg, No. 922842A, 1994 WL 879659, at *2 n.6 (Mass. Super.
Feb. 10, 1994) (O'Toole, J.).

   [2] Massachusetts courts have gone one step farther in the
case of claims for breach of fiduciary duty, holding such claims
begin to run only when the plaintiff has actual knowledge of the
injury.  See Doe, 446 Mass. at 254-55.  This Court need not
address this separate standard here because it finds Adley did
not have even constructive knowledge.

to send Adley tax and mortgage interest statements identical to those sent prior to the 2002 refinancing, see Trial Ex. A19, the Court cannot hold Adley to have had notice of the deed transfer. Mr. Burns's silence, together with the sending of these statements, would lead a reasonable person to believe that he was still a titled owner of the Property. Even had Mr. Burns informed Adley that a title change might occur in conjunction with the refinancing, a reasonable person could interpret the continued delivery of these statements proclaiming Adley to be an "equal[] 50% owner[]" as confirmation that a title change had not in fact transpired.

Because this Court has found that a reasonable person in Adley's position would not have reason to know of the deed transfer, the limitations period here did not begin to run until Adley received the results of the title search he performed in July 2015. Adley instituted this action on November 10, 2016, well within the three-year limitations period. The Court thus rejects the Defendants' statute of limitations defense.

**B.  Adley's Claims**

Adley brought five claims against the Defendants: (i) breach of fiduciary duty, (ii) fraud and deceit, (iii) intentional misrepresentation, (iv) unjust enrichment, and (v) imposition of a constructive trust.

**1.  Breach of Fiduciary Duty**

A plaintiff claiming breach of fiduciary duty must prove the following: "1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005) (Gorton, J.) (citing Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999)).

"A fiduciary duty exists 'when one reposes faith, confidence, and trust in another's judgment and advice.'" Doe, 446 Mass. at 252 (quoting Van Brode Grp., Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 516 (1994)). Though some "familiar and well recognized" fiduciary relationships include "attorney and client, trustee and beneficiary, physician and patient, business partners, promoters or directors and a corporation, and employer and employee," Massachusetts courts have recognized that this list is not exhaustive and "[t]he existence of the relationship in any particular case is to be determined by the facts established." Warsofsky v. Sherman, 326 Mass. 290, 292-93 (1950). "Ordinarily, family relations do not suffice to create a fiduciary relationship that heightens scrutiny for fraud or undue influence." Cleary v. Cleary, 427 Mass. 286, 292-93 (1998). Such a relationship, however, "may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property

11

matters." Markell v. Sidney B. Pfeifer Found., Inc., 9 Mass.
App. Ct. 412, 444 (1980), abrogated on other grounds by Cleary,
427 Mass. 286.

Massachusetts courts have tended to find the existence of a
fiduciary relationship between family members in probate cases
alleging undue influence of an elderly relative, or in cases
where the court appeared to consider the individual otherwise
unable to make sound decisions for herself. See Rood v.
Newberg, 48 Mass. App. Ct. 185, 193 (1999) (fiduciary
relationship between decedent and grandson); Markell, 9 Mass.
App. Ct. at 444-45 (fiduciary relationship between decedent and
nephew); see also Stetson v. French, 321 Mass. 195, 199 (1947)
(fiduciary relationship existed between "a capable man of
affairs and of property" and his "illiterate" brothers, one of
whom was "somewhat deficient mentally"); Hawkes v. Lackey, 207
Mass. 424, 431 (1911) (fiduciary duty owed to female relatives
who had "scarcely any business experience" and "were almost like
children in money matters"). By contrast, they have declined to
find a fiduciary relationship from family members' promises
relating to land conveyances, where no additional factors
supporting a fiduciary relationship existed. See Kelly v.
Kelly, 358 Mass. 154, 156 (1970) ("It is settled in this
Commonwealth that a fiduciary relationship does not arise merely
because the parties to a conveyance are members of the same

family, even if the transferee promised to hold the land in trust."); Meskell v. Meskell, 355 Mass. 148, 152 (1969); Kemp v. Kemp, 248 Mass. 354, 357 (1924).

This Court cannot conclude that a fiduciary relationship existed between Adley and the Defendants.  While Adley may have trusted in the Defendants' judgment regarding the day-to-day maintenance of the Property while he resided across the country, and the Defendants may have promised to maintain the Property in a way amenable to both parties, this agreement is insufficient to establish a fiduciary duty.  Adley, a fully independent adult and then-active federal agent, was fully capable of making his own business decisions and thus was not dependent on the Defendants' judgment in the same way as the individuals in Rood and Markell.  He simply respected that judgment.  See Comstock v. Livingston, 210 Mass. 581, 584 (1912) ("Mere respect for the judgment of another or trust in his character is not enough to constitute . . . a [fiduciary] relation.").  Consequently, no breach of fiduciary duty can be held to have occurred here.

### 2.   Fraud, Deceit, and Intentional Misrepresentation

To prove fraudulent misrepresentation under Massachusetts law, a plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and

acted upon it to his damage." Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982) (quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963)); see also Kilroy v. Barron, 326 Mass. 464, 465 (1950).

Here, the alleged false representation is Mr. Burns's continued statements declaring Adley to be a 50% owner for purposes of taking certain tax deductions. See Compl. ¶¶ 34, 44-46. As an initial matter, the falsity of the statements is questionable: The statements merely assert Adley to be a "50% owner[]," not a titled owner, Trial Ex. A19, and Adley is indeed an owner in equity. Even considering the statements false insofar as they suggest that Adley's right to take these deductions is beyond doubt, Adley has not proven that Mr. Burns sent these statements with the knowledge that Adley's right to take the deductions was in fact not assured. This Court found that Mr. Burns did not realize that Adley might have been exposed to liability for taking such deductions without being on the deed, see supra, and thus Mr. Burns's actions do not amount to actionable fraud.

The complaint also alleges that the Defendants failed to disclose to Adley that they transferred the deed and that they took out the home equity loans. Typically, "nondisclosure does not amount to fraud and is not a conventional tort of any kind." Greenery Rehab. Group, Inc. v. Antaramian, 36 Mass. App. Ct. 73,

77 (1994). In certain cases, however, nondisclosure may amount to fraud when there exists a duty to disclose. See id. at 78. This duty "may arise if there is a 'fiduciary or other similar relation of trust and confidence between [the parties].'" Rood, 48 Mass. App. Ct. at 192.

Because this Court found there to be no fiduciary relationship between the parties, the Defendants were not under a duty to disclose that would lead to liability here. See Urman v. S. Boston Sav. Bank, 424 Mass. 165, 168 (1997) (rejecting fraud claim where defendant "did not make representations of any kind . . . and did not stand in a fiduciary relationship to the plaintiffs"); Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 678 (1942). Even had a duty existed, however, the evidence shows that the Defendants did not make this omission with the purpose of inducing any reliance on Adley's part.

### 3. Unjust Enrichment

Unjust enrichment arises where one party "retains the property of another 'against the fundamental principles of justice or equity and good conscience.'" Bonina v. Sheppard, 91 Mass. App. Ct. 622, 625 (2017) (quoting Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005)). To show unjust enrichment, "[t]he plaintiff must establish 'not only that the defendant received a benefit, but also that such a benefit was unjust.'" Id. (quoting Metropolitan Life Ins. Co. v. Cotter, 464 Mass.

623, 644 (2013)).  In determining whether the benefit was
unjust, courts must look to the "reasonable expectations of the
parties."  Cotter, 464 Mass. at 644 (quoting Global Investors
Agent Corp. v. National Fire Ins. Co., 76 Mass. App. Ct. 812,
826 (2010)).  Though claims for unjust enrichment are available
only where there is no adequate remedy at law, see Santagate, 64
Mass. App. Ct. at 329, this Court's holdings above establish
that Adley's claim meets that criterion.

Though this Court found that there was no intent to defraud
Adley with the deed transfer, it also found that Adley was
unaware of the transfer and did not consent.  He had provided
substantial financial contributions to the Property at that
point, and he did not receive anything approaching a fair pay-
out for his share of the Property.  Further, the evidence shows
that prior to this litigation, the Defendants continuously
believed Adley to be a fifty percent owner in equity, see, e.g.,
Trial Ex. A19, and thus Adley's expectations that he continued
to be a fifty percent owner were reasonable.  As a result, the
Defendants were unjustly enriched by obtaining full legal title
of the Property, and they do not have the right to retain one
hundred percent of its ownership.

The Defendants were also unjustly enriched by virtue of the
HELOCs that they took out.  See Trial Exs. A11, A12.  This
further equity taken out of the Property extended the length of

16

time that the Property would be encumbered by debt as well as increased the amount of debt, and the entire benefit derived from the extra debt went to the Defendants, rather than to Adley.   The Defendants further admit that the HELOC is "entirely [their] responsi[bility]."   Defs.' Statement of Facts ¶ 43. Consequently, "equity and good conscience" demand that Adley be compensated in some way to account for the cost of this added encumbrance.

### 4.   Constructive Trust

Massachusetts courts have recognized that the proper remedy for unjust enrichment is an equitable one.   See Santagate, 64 Mass. App. Ct. at 329.   The Court has broad discretion to fashion the equitable remedy it considers most appropriate, as "[e]quitable remedies are flexible tools to be applied with the focus on fairness and justice."   Demoulas v. Demoulas, 428 Mass. 555, 580 (1998); see Johnson v. Martignetti, 374 Mass. 784, 794 (1978).   One such remedy is a constructive trust, which "may be imposed to prevent injustice, unjust enrichment, or fraud." Sutton v. Valois, 66 Mass. App. Ct. 258, 266 (2006); see also State St. Bank & Tr. Co. v. Beale, 353 Mass. 103, 105 (1967) ("A constructive trust may be said to be a device employed in equity . . . in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud . . . .").

The Court is persuaded that imposing a constructive trust on the Property is the most appropriate remedy here. Through the imposition of a constructive trust, the Defendants must disgorge their unjust gains, Adley's rightful part-ownership of the Property will be restored to him, and the Court may fashion a division of the Property that accords with fairness under the parties' original agreement.

### C. The Defendants' Counterclaims

The Defendants bring two counterclaims against Adley: (i) breach of contract and (ii) unjust enrichment. Defs.' Answer & Countercls. 11-12.

#### 1. Breach of Contract

The Defendants claim that Adley breached their oral agreement to split equally all expenses relating to the Property. Defs.' Answer & Countercls. 11. They allege that after depositing the "required monthly contribution" into the joint checking account for several years, Adley "arbitrarily and unilaterally decided to decrease" those contributions "well below what was required to cover his fifty percent of expenses." Id. at 9. The Defendants further claim that Adley did not contribute to the repairs needed after the pipe burst in 2015. Id. at 10-11.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material

terms of that contract, and the parties must have a present intention to be bound by that agreement." Lambert v. Fleet Nat'l Bank, 449 Mass. 119, 123 (2007). A contract may be binding even where some terms are not "precisely specified" or defined, but the parties "must . . . have progressed beyond the stage of 'imperfect negotiation.'" Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). Here, it is undisputed that the parties agreed to share equity in the Property and bear all expenses on an equal basis. Admitted Facts ¶¶ 2-4. Given this agreement and the testimony at trial, the Court concludes that the parties entered into an enforceable contract by which they had the present intention to be bound.[3]

---

[3] To the extent that Adley raised the affirmative defense that the contract fails to satisfy the Statute of Frauds, Pl.'s Answer 5, ECF No. 17, his testimony that the agreement was never committed to writing is insufficient to convince this Court that the contract is unenforceable. The Massachusetts statute codifying the common law Statute of Frauds requires a writing for several types of agreements, two of which are potentially applicable here: agreements for the sale of land and agreements that cannot be performed within one year. See Mass. Gen. Laws ch. 259 § 1. Because the agreement here is best characterized as one "for the sharing of real estate profits and losses," it is not a contract for the sale of land but one "in the nature of an oral partnership agreement or joint venture . . . ordinarily not within the purview of the Statute of Frauds." Greenfield v. Pearlstein, 1995 Mass. App. Div. 30 (Dist. Ct. 1995); see also Fencer v. Wills, 259 Mass. 546, 549 (1927) (explaining that an agreement was "not a contract for the sale of lands or any interest in land" where it "concerned alone the matter of profits and losses arising, or which might arise, from the sale of lands purchased and held under the terms of the agreement").
    Nor is the agreement here one "that is not to be performed within one year from the making thereof." Mass. Gen. Laws ch.

At trial, the Defendants introduced evidence that Adley
lowered his monthly payments starting in 1999. See Trial Exs.
A16, A18. Adley admitted this fact, testifying that he lowered
the payments because the joint account had a surplus of funds
and he thought the amount he was putting in was unnecessarily
high to cover his fifty-percent share of the expenses. Even
were this true at the time, however, the Defendants offered
additional evidence that overall, they contributed more than one
hundred thousand dollars over the amount that Adley contributed
to the Property's expenses. See Trial Exs. 16, 18. Though some
evidence offered at trial showed that the Defendants had not
credited Adley for approximately $19,500 that he contributed in
the years 1992 and 1993, see Trial Ex. A3, Adley did not offer

---

259 § 1. Massachusetts courts have consistently held that this
provision "does not apply to contracts which may be performed
within, although they may also extend beyond," one year.
Rowland v. Hackel, 243 Mass. 160, 162 (1922). "[A]ny
understanding that the agreement was not to be performed within
a year 'is to be absolute and certain, and not to depend on any
contingency.'" Joseph Martin, Inc. v. McNulty, 300 Mass. 573,
577 (1938) (quoting Peters v. Westborough, 36 Mass. 364, 367
(1837)). Though the parties here may have contemplated that
their investment in the Property would span many years, there is
no evidence that they discussed the contract's length, and it is
conceivable that they might have sold the Property within a
year, discharging their contractual obligations. The Statute of
Frauds thus does not bar enforcement of the contract. See Meng
v. Trustees of Boston Univ., 44 Mass. App. Ct. 650, 652 (1998)
("[A]n oral contract for a brokerage commission to sell land
after it was prepared for development is enforceable under the
Statute of Frauds, despite the fact that the parties may
contemplate that sales will not be completed for more than one
year.").

any further evidence to show that he had matched the Defendants'
outlays.[4]  This Court thus holds that Adley breached this
contract by failing to pay for his fifty-percent share of the
Property's expenses.

"The usual rule for damages in a breach of contract case is
that the injured party should be put in the position they would
have been in had the contact [sic] been performed." Malouf, 430
Mass. at 880.  Because the Court has imposed a constructive
trust on the Property, the Defendants will not receive damages,
but they will be awarded a percentage of the Property's equity
proportionate to the amount by which their contributions
exceeded Adley's.

### 2.   Unjust Enrichment

The Defendants also bring a claim of unjust enrichment,
asserting that Adley unjustly received the benefit of the work
they performed over the years to maintain and improve the
Property.  Defs.' Answer & Countercls. 11-12.  This work
allegedly included bookkeeping, payment of bills, routine
maintenance of the Property, performance of various "upgrades"
to the Property (such as the building of a deck and the

---

[4] Adley also claimed that he had contributed $30,000 to the
initial purchase of the Property, and that the Defendants
credited him for only $20,000, Pl.'s Mem. Cash Contributions 2,
ECF No. 41, but even were this true it would not account for the
remainder of the balance he owes.  Further, this Court is
unpersuaded by his testimony for the reasons expressed infra.

installation of driveway lighting), and the handling of all repairs and insurance claims stemming from the burst pipe in 2015. Id. at 7-11.

To the extent that this claim rests on Adley's failure to pay his share of the Property's expenses, the Defendants cannot recover under a theory of unjust enrichment because they have a remedy at law. See Santagate, 64 Mass. App. Ct. at 329. The Defendants also claim, however, that Adley was unjustly enriched by virtue of the "sweat equity," or nonmonetary contributions, they provided to improve and maintain the Property. Defs.' Answer & Countercls. 11-12; Defs.' Statement of Facts 9-10. It is undisputed, however, that the Defendants also enjoyed greater use of the Property and of these additions, whereas Adley only visited the Property a few times a year. Defs.' Statement of Facts 3; Admitted Facts ¶ 9. It is further undisputed that this inequality of use was understood and expected at the time that the parties made their agreement. Defs.' Statement of Facts ¶ 13. All of the evidence adduced at trial shows that the parties contemplated that in exchange for Adley's equal contributions to the joint account for the Property's expenses (despite his infrequent use of the Property), he would not be expected to handle the Property's upkeep or help with home improvement projects requiring physical presence at the Property. In turn, the Defendants would take on the routine maintenance, but also

enjoy greater use of the Property. Consequently, the Defendants
did not reasonably expect that Adley would contribute
financially each time Mr. Burns mowed the lawn or installed an
upgrade to the Property. Nor did the Defendants reasonably
expect that Adley would pay an additional amount for Mr. Burns's
services as bookkeeper and accountant. This Court thus cannot
conclude that Adley has received a benefit from these services
that offends "the fundamental principles of justice." Bonina,
91 Mass. App. Ct. at 625 (quoting Santagate, 64 Mass. App. Ct.
at 329).

## IV. PERCENTAGE OWNERSHIP OF THE PROPERTY

Having imposed a constructive trust on the Property, the
Court now proceeds to determine each party's relative interest
in the Property. The parties generally agree that their
contributions to the Property are accurately reflected in Mr.
Burns's master bookkeeping spreadsheet introduced at trial, but
they dispute four particular contributions. See Pl.'s Mem. Cash
Contributions, ECF No. 41; Defs.' Mem. Cash Contributions, ECF
No. 40; Trial Ex. A18.

First, Adley claims that whereas the Defendants provided an
initial contribution of $20,000 to the Property, he made an
initial contribution of $30,000 to the Property. Pl.'s Mem.
Cash Contributions 2. The Defendants claim that Adley provided
$20,000 to the initial pool of funds, a contribution equal to

their own.  Defs.' Mem. Cash Contributions 3.  Because no
documentation of these contributions was offered by either
party, the only evidence introduced on this point was the
conflicting testimony of Adley and Mr. Burns.  Given the
temporal proximity of this contribution to the original
agreement that the parties would split all expenses equally, the
Court is persuaded by Mr. Burns's testimony that the parties
each contributed $20,000 to the initial fund.

Second, Adley claims that Mr. Burns's master bookkeeping
spreadsheet failed to account for approximately $19,500 that he
contributed to the Property in 1992 and 1993.  Pl.'s Mem. Cash
Contributions 2-3; Trial Ex. A18.  He points out that the
balance sheets prepared by Mr. Burns during those years reflect
these additional contributions.  Pl.'s Mem. Cash Contributions
2-3; Trial Ex. A3.  Because the Defendants do not address the
exclusion of these figures from the master spreadsheet, and the
Court can discern no reason that they should have been excluded,
the Court credits Adley with these contributions.

Third, Adley claims that the Defendants overstated certain
contributions that they made in 1993 and 1994.  Pl.'s Mem. Cash
Contributions 3-4.  He again points to certain inconsistencies
in the various tables prepared by Mr. Burns, as well as the
joint account statements.  Id.  This Court is unwilling to
conclude that the Defendants did not make these contributions

simply because they were recorded in only one spreadsheet. Indeed, because the Defendants resided in closer physical proximity to the Property and handled payment of all bills and expenses, it is entirely possible that they made certain direct contributions not reflected in the joint account or other tables prepared by Mr. Burns. Adley has provided no recordkeeping of his own to demonstrate otherwise, and so the Defendants will be credited for those contributions.

Fourth, the Defendants request credit for the contributions they have made to the Property since this lawsuit began. Defs.' Mem. Cash Contributions 4. Adley does not claim to have made any contributions of his own during this time, but he argues that the Defendants failed to introduce the records of these payments into evidence at trial and consequently they ought not be considered. Trial judges have the discretion to reopen the record and consider additional evidence when they deem it appropriate. See Holland v. Jachmann, 85 Mass. App. Ct. 1120 (2014); Caffyn v. Caffyn, 70 Mass. App. Ct. 37, 43 (2007). It is undisputed that the Defendants continued to handle the Property's maintenance and accounting needs throughout this litigation, Admitted Facts ¶ 19, which reasonably requires the payment of the mortgage, property taxes, and other bills. Adley was on notice of these recurrent costs and had (but neglected to take advantage of) the opportunity to question the Defendants as

to their payment at trial.  The Court thus will permit the evidence of the amount of such costs and credit it toward the Defendants' share of the Property.

After establishing the total contributions made by each party, the Court deducts the amount that each party obtained from the proceeds of the 2002 refinancing.  The below chart demonstrates the calculation of the total percentage interest of the Property assigned to each party:

**Table 1**

|  | Adley | The Defendants |
|---|---|---|
| Initial Contribution | $    20,000.00 | $    20,000.00 |
| Adley's 1992-1993 Uncredited Cash Contributions | $    19,457.38 | -- |
| Documented Cash Contributions | $  309,675.00 | $  456,635.00 |
| The Defendants' Post-Suit Contributions | -- | $    37,604.00 |
| Subtotal: | $  349,132.38 |  |
| 2002 Refinancing Adjustment | -$    10,000.00 | -$    85,000.00 |
| Total: | $  339,132.38 | $  429,239.00 |
| Percentage Ownership: | 44.14% | 55.86% |

## V.   SALE OF THE PROPERTY

This Court ruled that the Property will be sold in a commercially reasonable manner by an appointed real estate broker.  Because the parties were unable to agree on a broker, this Court appoints Kathy Craig of Robert Paul Properties, Osterville, MA, as Special Master to handle the sale of the Property.

The Court also ruled that the debt stemming from the HELOC was the sole responsibility of the Defendants.   Though the Defendants paid off the HELOC balance of $187,167.65 in 2016, they did so by rolling it into a new mortgage.   Admitted Facts ¶ 18; Trial Ex. A14.   Thus, some adjustment must be made to ensure that Adley does not bear any burden of the debt deriving from the HELOC.   The parties agree that the $187,000 ought be extinguished at the closing of the Property's sale from the Defendants' portion of their equitable share of the proceeds, see Pl.'s Mem. Cash Contributions at 5; Defs.' Mem. Cash Contributions at 5, and the Court accepts this arrangement.

## VI.   CONCLUSION

For the foregoing reasons, the Court imposes a constructive trust on the Property and orders it to be sold.   The parties will divide the proceeds of the sale according to their percentage interest in the Property, determined to be 44.14% for Adley and 55.86% for the Defendants, and subject to the extinguishing of the HELOC-related liability from the Defendants' equitable share.

**SO ORDERED.**

*William G. Young*
/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE